R. C. CROSON v. H. A. MARSH.

Eastern Section. July 24, 1926.

34

Whitaker & Whitaker, of Chattanooga, for plaintiff in error.

J. L. Spurlock and C. S. Littleton, both of Chattanooga, for defendant in error.

SNODGRASS, J.   This case grew out of injuries inflicted in the overturning of an automobile, being owned and driven by the defendant, in which the plaintiff and another party, the witness Roach, were riding as guests of the defendant.   The catastrophe occurred on or about the 30th day of November, 1924, about nine o'clock at night, about fourteen and one-half miles out from Chattanooga on what is known as the Brainard road.   The parties were returning to Chattanooga from the house of one Jim Camp, a brother-in-law of the witness Roach, where they had had dinner.

The plaintiff, on the original hearing, described the accident as follows: ,

"Q.   While you were taking that trip with him did you have an accident of any sort?   A.   Well I will say we did; we ran into some rocks in the road—I think there was two in the road, and I think we hit both of them.   I don't know, but anyhow he lost control of the car, and that threw him into a pile of logs and broke off two of the wheels, and that threw us over the logs and we went about twenty feet, and then we hit the logs and that broke off the wheels on the right hand side and completely turned the car over and pinned

me under the steering wheel and threw him out. Mr. D. L. Roach was behind in the back seat, and the cushion caught his head and held him so that he could not move."

Mr. D. L. Roach described the accident as follows:

"When we hit the rocks it give a sudden jar and the next thing I knew I was down and I did not know anything for awhile; after the car hit the rocks, why then it went on and went into these logs, hit the ends of the logs, and it slid over the logs like this, (indicating) and that threw the car over and he stopped his engine.

"Q: In other words the car turned two somersaults?" A. Yes, it turned over twice.

"Q. In this thing? A. Yes, sir.

"Q. How many logs were there on the side of the road? A. I don't know, there was a whole pile of them.

"Q. What was the result of this accident; what happened to the occupants of the car? A. Well what happened to me was this: When it struck the logs I was knocked down between the seats, and I just went down like that, (indicating) and it turned me over and the cushion caught me across my throat and it held me down in there. I heard the car stop, and they must have been pinned down in there some way, but I heard Mr. Marsh getting Mr. Croson out from the steering wheel, and Mr. Marsh was calling to me, but I could not answer. I could not speak because that cushion had caught me across my throat, and it was holding me down in there and I could not speak. He called a half dozen times, and when he got Mr. Croson out he came back there to where I was and he saw how I was pinned back there, and they shifted the car off of me and got me out, and after he got me out he asked me if I was hurt, and I told him that I did not think I was hurt much; there was a little place in my head that was bloody and was hurt, and my left arm was hurt a little."

He testified further that it tore the front wheels up, tore up the top and ruined it, and in fact tore all the wheels off of the car—that the wheels were not off of the car, but they were all torn up—the spokes were just ground out and torn up.

Mr. Croson described his injuries to be, that his back was wrenched, that he was bruised all the way down from his shoulders to his knees, and black and blue; that he suffered with that for about four weeks, and that it left him with a large blood clot on his hip, which he said he still had; that he could feel it all of the time; that it was just like a gristle; that it could be covered with the palm of the hand; that his back was not strong; that his

work is stooping over and, while he did not have to do any heavy lifting, that he had to stoop over and that it hurt him continually, and that it was hurting him then; that if he did any stooping it hurt him. His work was that of a quilter and he worked for the Dixie Mercerizing Company. He testified that it was not heavy work, that is, that he did not have any heavy lifting to do, but that he had to stoop down thousands of times a day, and that it hurt him to do it; that he had to stoop down to take up the ends of the thread; that he was in bed about two weeks, but off from work for four weeks; that he was treated by a Dr. Banks, and was still under treatment.

Mr. Roach testified that he went to see the plaintiff the next day after it happened and he seemed to be hurt some; that he was hurt in the back, and there was a place on his hip that was right black.

The plaintiff testified that at the time of the accident they were running from thirty to thirty-six miles an hour.

The negligence alleged in the declaration, upon which the liability was predicated is: (1) That the defendant at the time aforesaid did unlawfully, negligently, and carelessly run his said car in excess of twenty miles an hour, contrary to the statute of Tennessee regulating the speed of automobiles. (2) Defendant carelessly and negligently failed to keep a lookout ahead while operating said car, and carelessly and negligently ran the same into a large rock in the road, causing the same to run into a pile of logs and overturn, injuring plantiff as herein alleged, all of which, it was averred, was due to the proximate negligence of the defendant and without fault on plaintiff's part, and to his damage in the sum aforesaid, which had been previously averred as twenty thousand dollars.

The plea was not guilty, and the proof on the first trial eliminated the negligence averred as to the lookout, as owing to the location of the rocks around a little curve and just over a little hill, going at the rate of speed they were travelling it was conceded that the rocks under the circumstances could not have been seen in time to have stopped the car, though it was insisted that, had they been going at the rate of fifteen miles an hour, it might have been done.

It is proper to state that while Mr. Roach stated on cross-examination that he had made a statement to Mr. Spurlock that he thought the car was running twenty miles an hour, but he said he had the curtains up and was sitting on the back seat—that he could not tell—could not state positively—that he could not make a statement of any kind like the speed it was running.

He was asked to give his best judgment as to the rate of speed the car was running, to which he replied that he would hate to make a statement about it, but said:

"We must have been running faster than twenty miles an hour, the way the car acted when it hit those rocks."

Following this there appears this objection: "Objected to. Objection sustained." The questioning then continued:

"Q. I will ask you to tell us what the car did do. A. Well it swung around after it hit those rocks and hit these logs.

"Q. Where did it go after it hit the rocks? A. It went on a pile of logs."

He was also asked:

"Q. Did you hear Mr. Croson say anything to Mr. Marsh with reference to the speed that he was running?"

To which he replied:

"A. Well, I don't remember now. It seems like he did say something, that he must be running fast; I don't remember now what he said."

On cross-examination regarding the rate of speed they were going, and the circumstances, the plaintiff testified as follows:

"Q. You say this was a Ford car? A. Yes, a Ford.

"Q. And it was running between thirty and thirty-five miles an hour? A. Yes, sir.

"Q. Was she holding the road well? A. Well you know about a Ford car when one is making thirty or thirty-five miles an hour. It seemed sometimes like the hind end was in front.

"Q. Did you say anything to the driver about driving fast? A. Well he was driving the car, and I did not have any control over him.

"Q. Did you try? A. Not then, afterwards I did.

"Q. Did you say anything to him? A. I told him I thought he was going pretty fast.

"Q. You say that you thought that you were going pretty fast? A. Well, I did not know much about a Ford car.

"Q. Well, it was hitting it up between thirty and thirty-five miles an hour? A. That's right.

"Q. About how long had you been out on the road? A. We was about a half or three quarters of a mile from where we had taken supper.

"Q. Got up that speed in going that distance? A. Yes, sir.

"Q. Took that long to get started, did it not? A. Well 1 don't know, I know we was going fast.

"Q. You had just started up the road, and by the time you got to where this turn in the road was there you are positive that you were going between twenty and thirty-five miles an hour? A. Yes, sir, I should judge that we were going between thirty and thirty-five miles an hour by the time we hit the top of that little grade."

In his original cross-examination he was asked as to a statement he too had made to Mr. Spurlock, and what the statement was and why he had made it, and he stated that he had told Mr. Spurlock that he thought possibly the automobile was running about fifteen miles an hour; that he had made the statement to protect Mr. Marsh; that he thought if they found out that Mr. Marsh was running over twenty miles an hour, violating the speed limit of thirty miles an hour, that they might get him; that he thought it was a criminal offense. He was cross-examined as to these statements as follows:

"Q. And you say when he asked you about it that the reason why you told this falsehood was what? A. The reason I told him was to protect Mr. Marsh. I thought that the law might get him if he drove the car in excess of the speed limit and I did not want to do anything.

"Q. And so in the interest of this friend of yours you were willing to tell a falsehood? A. I was not swearing on oath; I did not swear to nothing.

"Q. But you meant to state a falsehood? A. Well I did not know Mr. Spurlock who he was, and I did not know that it was any of his business anyhow.

"Q. So you told a deliberate untruth about what rate of speed was and at that time you stated the car was running fifteen miles an hour? A. Yes, sir.

"Q. And that was in the interest of Mr. Marsh?" A. It was.

"Q. Of course you would not state anything or mistake (misstate?) anything in your own interest, you would do more for him than you would do for yourself, that is true, is it not? A. Well I don't know as I wanted to aid anyone, but I wanted to protect him from the law.

"Q. Is it not a fact that the facts of the accident were fresher in your mind then than they are now, at the time Mr. Spurlock came out there to see you about this case, and that to the best of your recollection the car was only going fifteen miles an hour, and you so stated that at the time when

you made that statement, and that subsequently you determined that you might be able to get something out of your friend,"

Objected to.

"and that then you made up your mind to swear that it was going over twenty miles an hour? A. I never thought about getting anything from him until your adjuster came out there and tried to make a settlement."

MR. LITTLETON: "I move the court to exclude that."

THE COURT: "Yes, sir."

"Q. You made some other statements about this case on that occasion, did you not? I will ask if Mr. Spurlock did not ask you this question: 'Did you see the rocks and logs long before you hit them?' and if you did not answer, 'Yes, and we tried to avoid them.' A. We tried to avoid the rocks.

"Q. The point is, did you not see the rocks long before you hit them? A. I don't know whether I seen them or not; I don't know whether I seen the rocks or not. I told you that I thought we hit both rocks.

"Q. You think that you hit both rocks? A. Yes, we hit one rock, and I think two rocks that were there, and Mr. Marsh lost control of the steering wheel.

"Q. Did you not state when the matter was fresh in your mind that you saw the rocks before you hit them? A. Well, I may have.

After some further cross-examination he was asked:

"Q. You state to the jury now, do you not, that as far as Mr. Marsh was concerned, he did everything he possibly could to avoid the accident, and that the only negligence of which he was guilty was in running too fast? A. Yes, if he had been running fifteen miles an hour he could have stopped in two lengths of his car at least.

"Q. He could have stopped in that distance running fifteen miles an hour? A. Yes, sir.

"Q. And the fact that he was running too fast is the reason for the accident? A. That is the reason for this accident.

"Q. If he had been driving slow, or at a moderate rate of speed, you would not have had an accident? A. No, sir.

"Q. That was the sole cause of the accident? A. Yes, sir.

"Q. From the time that you started up at the house until you hit the rocks, as you say, how fast was the car going? A. I don't know how fast it was going.

"Q. But you say that you were coming down the pike there at thirty to thirty-five miles an hour? A. Well, we were going fast.

"Q. And you never protested to Mr. Marsh about the speed that he was making? A. No, sir, I did not protest, only I told him, I says 'Mr. Marsh we are running pretty fast,' and he just laughed.

"Q. Both of you laughed, did you not? A. He always laughs.

"Q. That is what you said to him? A. Yes, sir.

"Q. You did not appeal to him to run slower? A. Do you supopse that I could have controlled the driver of the car?

"Q. Well, I am not asking you about that. From the time you started from the house, which was but half a mile distant, you had got the speed up to thirty or thirty-five miles an hour? A. Yes, sir, I expect you could take your car and get it up to fifty miles an hour at that distance if you wanted to.

"Q. Do you think that you pick up that speed with a Ford car at that distance? A. Yes, sir, I think you can; he did at any rate.

"Q. How long did it take you after you started from this house before you got to these rocks? A. It did not take very long; it don't take long to go a half or three quarters of a mile.

"Q. How long does it take a Ford car to pick up a speed of thirty to thirty-five miles an hour? A. I expect you can pick up a speed of thirty-five miles an hour is four city blocks."

The foregoing is substantially the evidence introduced on the first trial, and as a question and an assignment is made on this evidence which, if found justified, would settle the lawsuit adversely to the plaintiff, the evidence is quoted at some length, as in the circumstances of the case it better justifies itself as a premise for the discussion than any necessary summary might do.

The defense never introduced any witnesses, but at the close of the plaintiff's proof moved for peremptory instructions, upon the ground of alleged contributory negligence of the plaintiff. It being contended that the sole cause of the accident was the excessive rate of speed at which the car was being driven, and the fact that the plaintiff made no protest to the driver, it was insisted that he was guilty of such contributory negligence as barred his recovery.

The court overruled this motion, and the defendant, declining to introduce any testimony, the case went to the jury on substantially the testimony quoted. The jury were unable to agree and a mistrial resulted.

The defendant made a motion for a new trial and a directed verdict, upon the ground that the court erred in failing to sustain defendant's motion for a directed verdict at the conclusion of the plaintiff's evidence, and of all the evidence, for the reason that it appeared upon the undisputed testimony that plaintiff was guilty of such contributory negligence as to bar a recovery; which was overruled and the wayside bill of exceptions perfected.

At the January term of the court 1926, the case came on again for trial before the judge and jury, upon substantially the same testimony, though somewhat elaborated and strengthened. The plaintiff was asked:

"Q. Now about how fast was that car running at the time that it struck the rocks in the road and then run into the pile of logs? A. It was running thirty or thirty-five miles an hour.

"Q. Between what? A. Between thirty or thirty-five miles an hour.

"Q. At night? A. Yes, sir.

"Q. Going down hill? A. Going down hill.

"Q. What if anything did you say to Mr. Marsh, the defendant, the driver of the car immediately before the accident as to the rate of speed he was making? A. I told him he was running pretty fast.

"Q. Did you do it as a warning? A. Yes, sir.

"Q. And to protect yourself?

"Objected to because leading.

"The Court: Do not lead the witness.

"A. Yes, sir.

"Q. Why did you do that—why did you tell him he was running pretty fast? A. Well, I thought he was going too fast down that road—and down that hill, and it was dark.

"Q. What did he say? A. I don't know as he said anything; he did not have time to say anything.

"Q. How soon after that did the accident happen, after you had given him that word of caution?

"Objected to.

"Q. How soon before the accident occurred, after you spoke to him about the rate of speed the car was going? A. Well, almost immediately, because we was going down hill then.

"Q. Did you see that rock in the road before the car struck it? A. No, sir.

"Q. Did you see it beforehand? A. No, sir."

At the close of the plaintiff's evidence the defendant moved the court for peremptory instructions to the jury to return a verdict in favor of the defndant, upon the grounds that there is no evidence to support a verdict, and upon the further ground that on the undisputed facts of the record there is such contributory negligence on the part of the plaintiff as to bar any recovery. The court overruled the motion, stating:

"Well, we will submit this case to the jury. I don't think the court can decide the question of contributory negligence, but I am going to charge the jury on that. Let the jury come in."

The jury thereupon returned and the defendant, declining to introduce any evidence, the case was then submitted to the jury upon the plaintiff's proof, and the jury returned a verdict in favor of the plaintiff for $2500 and judgment was entered accordingly.

The defendant then made a motion for a new trial, and for the court to direct a verdict, as follows:

"Comes defendant, H. A. Marsh, and moves the court for a new trial and a directed verdict in this cause, and for cause says:

" 'The court erred in failing to sustain defendant's motion for a directed verdict at the conclusion of plaintiff's evidence, and all of the evidence, for the reason that it appeared upon the undisputed testimony that plaintiff was guilty of such contributory negligence as to bar recovery.' "

The court acted on this in the following order entered of record:

"The court, after due consideration of defendant's motion for a new trial and a directed verdict granted the same and dismissed plaintiff's case, to which plaintiff excepted."

The plaintiff then entered a motion for a new trial, which being overruled, he has appealed to this court and assigned the following as error:

"I. The trial court erred in sustaining the defendant's motion for a new trial and entering an order for peremptory instructions directing that a verdict be returned in favor of the defendant on the ground that there was no evidence to sustain the verdict of the jury and thereupon dismissing plaintiff's suit.

"II. The trial court erred in holding, on defendant's motion for a new trial, that there was no evidence to support the verdict in this case.

"III. The trial court erred in granting defendant's motion for a new trial and entering a directed verdict and dismissing plaintiff's case, for the reason that the preponderance of the evidence shows that defendant at the time of the accident was exceeding the twenty miles speed limit fixed by statute and that the plaintiff gave the defendant warning to this effect in the way of protesting and objecting to the rate of speed at which defendant was running said automobile, and hence the verdict of the jury should have been permitted to stand.

"IV. The trial court erred in holding, on defendant's motion for a new trial, that plaintiff was guilty of contributory negligence proximately contributing to his injury, in failing to sufficiently warn or protest against the excessive rate of speed at which defendant was running his automobile at the time of the accident.

"(a) Because the warning or protest was definite and sufficient to relieve plaintiff of any contributory negligence.

"(b) Because plaintiff protested or warned defendant the moment he discovered the automobile was being run at an excessive rate of speed.

"(c) Because under the undisputed facts in the case with reference to the distance, time and conditions—the curtains of the automobile being up and it being dark—plaintiff would not, under these facts, have been guilty of any contributory negligence, even in the absence of protesting or warning or calling defendant's attention to the rate of speed the automobile was going at the time of the accident."

The defendant, filing the record for writ of error, has assigned that:

"The court erred in failing to sustain defendant's motion for a directed verdict on the first trial of this cause, at the conclusion of plaintiff's evidence and of all the evidence; for the reason that it appeared from the undisputed testimony that plaintiff was guilty of such contributory negligence as to bar recovery."

Taking up the assignment of error of the defendant Marsh first, we think there can be no question but what the court was correct in refusing to give the peremptory instructions asked for on the first trial.

It was conceded that to operate a car at a rate of speed greater than the law allows is negligence per se. The only questions were, therefore, was this car being so operated at the time of the accident? And, if so, was such excessive speed the proximate cause of the injury? And also, was the plaintiff himself guilty

of any negligence which proximately contributed to his injury? All these questions were matters for the jury, about which there was any controversy or from which there might spring a reasonable diversity of opinion.

"Any act must be held negligence in law, or negligence as a matter of law, where no reasonable difference of opinion can exist among men as to the negligent character of the act." 9 Ency. Digest, page 465; Knoxville Traction Co. v. Carrol, 113 Tenn., 514; Traction Co. v. Brown, 115 Tenn., 323, 330.

In this latter case it is said:

"It is said in the case of Grand Trunk Railroad Company v. Ives, 144 U. S., 417, 12 Sup. Ct., 679, 36 L. Ed., 485, that the terms 'ordinary care' and 'reasonable prudence' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and say whether the conduct of the parties in that case is such as would be expected of reasonably prudent men under a similar state of affairs. When a given state of facts is such as reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court."

This case cites a number of cases illustrative of the rule.

That plaintiff was injured in the circumstance of the wrecking of the automobile there was and could have been no controversy; that it was owned and being driven at the time by the defendant in excess of twenty miles an hour, and from thirty to thirty-five, was testified to by the plaintiff, and corroborated by all the physical circumstances of the case and the inherent probabilities of his story. The graphic description of the night ride and the wreck, upon reaching the down grade and going over the rise from the little dip in the road upon the rocks around the curve, and the utter wreck of the car as it struck the rocks and catapulted over the logs, tearing off the wheels, turning over twice and changing ends, with the two men fastened under it, are striking testimonials of its momentum, corroborating the testimony of the plaintiff; and when there was no testimony to the contrary, save an admitted false

statement that the plaintiff had made to the attorney, Mr. Spurlock, shortly after the accident happened, that the car was running fifteen miles an hour, when, evidently in the interest of an insurance company, Mr. Spurlock had gone to see him with a stenographer. This was explained, that it had.been made to protect Mr. Marsh from an apprehended prosecution for violating the law as to the speed limit. While no benevolent purpose will justify falsehood, and while it is not meant to approve this false statement upon any machiavellian philosophy, notwithstanding there be many votaries of this creed, we do not think it worked any judicial estoppel, bringing it within the provisions of Johnston v. C. N. O. & T. P. Ry. Co., 146 Tenn., 120, and the authorities there cited upon the subject. Rather is it a question of the credibility of the witness, a matter also for the jury, and not for the court in advance of their prerogative of first consideration.

Material statements made out of court contrary to those made upon the trial are proper to be shown as one of the means of impeaching a witness, but at last it is for the jury to say just how far, if at all, he has been successfully impeached; and even if he is impeached in any of the modes prescribed by the law, they are authorized to believe him in so far as he may be corroborated by other witnesses or circumstances of a corroborative character.

This is quite a different case from that of Johnston v. C. N. O. & T. P. Ry. Co., supra, where the only testimony to sustain a material point is by one who, in the same case, testifies both ways as to that point, thus not only creating a judicial estoppel, but nullifying his own testimony, and leaving it as though there was no proof upon the subject.

We think the only question as it stood at the close of the plaintiff's proof was as to the alleged contributory negligence of the plaintiff, and that was a matter for the jury. Neither of the other interested parties took the stand, which was in itself a circumstance, for if the car was not being operated in violation of law the defendant, who operated it, was certainly a very competent witness to establish that fact. While his attorneys, ostensibly representing him, are forced to severely criticize him as in collusion with the plaintiff and refusing them aid, it is somewhat ungracious under the circumstances. It may be reasonably attributable to the fact that he may find himself unable to furnish the aid in the shape of testimony that he was driving at a less rate of speed than that claimed by the plaintiff, or to detail any other circumstance affecting favorably the question of his (the plaintiff's) alleged contributory negligence.

From a careful analysis of all the testimony we cannot say but what there might have been a reasonable diversity of opinion as to whether he was guilty of negligence at all. There is no iron clad rule as to time or form of protest, or of even protest at all. It all depends upon circumstances. He was a guest, and the negligence of the defendant, if committed, was not imputable to him. He was required to act only as an ordinarily prudent man would have done under the circumstances. Under this rule he must have had time to reasonably discover that the plaintiff was exceeding the speed limit. If after that time there was time to protest, he should have done so. If after such protest it was apparent that it was unavailing, he should have demanded to stop and be let out of the car, if the circumstances were such that an ordinarily prudent man would have done so. If the negligent rate of speed was attained at a time or place when there was not time to make it before the accident, then no protest was required; or if after its being made there was not time to follow it up before the accident, then nothing more was required. All these under the proof above set out were matters for the jury, and it was for them to say, not whether or not a protest was made, or as to the form in which it was expressed, but whether or not, under all the facts and circumstances of the case the plaintiff acted as an ordinarily prudent man would have done. If he did he was not guilty of any contributory negligence that would bar his recovery. It follows, therefore, that the assignment of error of the defendant Marsh must be overruled.

We have examined the cases cited in the brief of counsel for the defendant Marsh, and think they are clearly distinguishable from the case at bar, where in attaining the dangerous speed they had only come one-half or three-quarters of a mile, and the accident happened almost immediately after the plaintiff called the attention of defendant to his speed.

We think this is determinative of the case. On the second trial the court, overruling the motion for peremptory instructions, announced that he would submit the case to the jury upon the question of contributory negligence. The jury, having found in favor of the plaintiff, it was implied that they did not think the plaintiff guilty of any such negligence. He set aside the verdict on such motion, which he should have done, being not satisfied with the conclusion of the jury that the plaintiff was not guilty of contributory negligence. But in any event, we think he was in error in dismissing the case, upon the ground that such negligence, if any, was a matter of law for his disposition, and the assignment

of error that he erred in dismissing the case is sustained. The case is different from that of Gray v. Grant, 5 Higgins 536, where the verdict was reinstated, the court having dismissed the case only for a supposed error of law in his charge. Reversed and remanded for a new trial.

Portrum and Thompson, JJ., concur.